Gail E. ABEITA, Plaintiff–Appellant,

v.

TRANSAMERICA MAILINGS, INC., et al., Defendants–Appellees.

No. 97–3264.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 21, 1998.

Decided Oct. 30, 1998.

**248**

Frank A. Chenette (argued and briefed), Cleveland, OH, for Plaintiff–Appellant.

Robert J. Valerian (argued and briefed), Kahn, Kleinman, Yanowitz & Arnson, Cleveland, OH, for Defendants–Appellees.

Before: KENNEDY and COLE, Circuit Judges; RUSSELL, District Judge.*

## OPINION

KENNEDY, Circuit Judge.

Plaintiff Gail E. Abeita brought sex-based hostile environment harassment, gender-based disparate treatment, and retaliation claims against defendants TransAmerica Mailings, Inc. ("TransAmerica") and Avrum S. Katz, President of TransAmerica. The District Court granted summary judgment to the defendants on all of plaintiff's claims. We affirm the District Court's grant of summary judgment on plaintiff's disparate treatment claim because plaintiff fails to establish either a *McDonnell Douglas* prima facie case or enough evidence to permit an inference of discrimination. We affirm the grant of summary judgment on her retaliation claim because plaintiff failed to present the retaliation claim to the Equal Employment Opportunity Commission ("EEOC"). We re-

verse the grant of summary judgment on plaintiff's hostile environment claim because the facts viewed in the light most favorable to the plaintiff would permit a jury to find objectively severe and pervasive harassment.

## I. Facts and Procedural History

As this appeal reviews the grant of summary judgment for the defendants, we view the facts in the light most favorable to Abeita. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

TransAmerica sells women's apparel, cosmetics, and jewelry by catalog and mail order.[1] Abeita worked at TransAmerica from September 2, 1986 until she was fired on June 3, 1993. Katz served as President of TransAmerica throughout the period of Abeita's employment and as Abeita's immediate supervisor from August 1990 until about 1992.

To support her hostile environment claim, plaintiff provided evidence of specific sexual and derogatory gender-based remarks by Katz and that Katz made sexual comments throughout her entire term of employment at TransAmerica. Only one of the specific remarks by Katz was made about Abeita, that is, Abeita was the subject of the remark. Katz stated to Abeita sometime before 1990: "oh, yellow dress and yellow shoes, yellow underwear too?"

Abeita, in an interrogatory response, also describes a number of statements by Katz concerning his sexual interest in other women:

> I was conversing with defendant Katz in the hallway when a young, attractive employee from defendant company walked by. After she went around the corner, defendant Katz stated to me something along the lines of "I'd really like to lay the pipe to her," or "I'd really like to lay her." Defendant Katz made comments of a sexual nature on a number of occasions indicating his attraction to her.[2]

* The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

1. TransAmerica was previously known as "Stork–Kit." References to TransAmerica throughout this opinion cover both companies.

2. In her deposition, plaintiff indicates that these

On another occasion, defendant Katz brought an attractive black-haired model through the defendant company facility on a tour. Defendant Katz had "discovered" her and was hoping some of us might be able to use her in our catalogs. Defendant Katz came back later and asked me if she would work for my catalog. I said something to the effect of "I don't know. What do you want me to do with her?" His response was something along the lines of: "Well, that doesn't matter. It's what I'd like to do with her that's important." One of the clothing catalogs had her photographed knowing that defendant Katz wanted her to be used. Only two photos might have been usable. Remarks were made about defendant Katz, and eyes were rolled and heads were shaking in disbelief.[3]

Over a period of two or three days approximately in 1991, Katz, in the presence of Abeita, made sexual comments about a model found in a Frederick's of Hollywood catalog. The comments included statements that the model had a terrific, sexy body and the model looked "hot;" how Katz would like the model's slippers under his bed; and how Katz would like to "warm her oven." Katz also expressed that he knew he was too old for the model and that unfortunately he was attracted to her. He stated that someone like her would not want someone like him. During these interactions between Katz and Abeita, Katz showed the Frederick's catalog to Abeita and pointed out the model, who was wearing "practically nothing" in the photos. Katz also expressed an intent to meet this model to Abeita. To achieve this, he arranged and attended a photography session. When Katz returned from the photo shoot, he expressed to Abeita his disappointment that the model had recently married. To the plaintiff's knowledge, the photos from that session were not used in any catalog produced or issued by TransAmerica.

In addition to these specific instances recounted by Abeita, she testified that Katz's sexual comments that "went beyond business and into the personal" about models and other female employees were "ongoing," "commonplace," "continuing," and too numerous to recall in detail beyond the detail described above.

Katz, in Abeita's presence, also made comments about women that were not sexual in nature but arguably reflect degrading gender stereotyping. Katz remarked that a female employee's weight was extreme and that the overweight female employee could iron clothes the company sent to customers by just sitting on the full boxes. Abeita asserts that Katz did not make statements about the weight of male employees.[4]

Abeita asserts that she complained to Katz about his statements many times, but Katz did not change his behavior. Abeita also complained to Alan Rosen, Executive Vice President at TransAmerica from October 1985 until August 1990, about the sexual comment Katz made to her when the attractive female employee passed Katz and Abeita standing in the hall. Rosen stated that he told Katz that "such remarks and behavior were inappropriate and unprofessional and yet Mr. Katz' behavior continued." Katz, at his deposition, conceded that TransAmerica does not have and never has had an anti-discrimination or harassment policy. Katz testified that "[w]e employ about almost ninety percent women, and I think the implication that we even had a need of it is ill taken."

In support of her disparate treatment claim, Abeita points to the testimony of Susan Coverdale, director of MIS at TransAmerica, that the pay scale for women at TransAmerica was "low." Ms. Coverdale expressed her belief that the defendant employed predominantly women because "it was easier to keep women at a lower pay." Alan

comments occurred approximately in 1987.

**3.** In her deposition, plaintiff indicates this occurred approximately in the Fall of 1992.

**4.** The plaintiff points to testimony by three other TransAmerica employees or former employees that shows Katz acting, outside of Abeita's pres-

ence, at least boorishly toward women in general or women other than Abeita. This evidence is irrelevant at this stage to plaintiff's hostile environment and disparate treatment claims because there is no evidence that plaintiff was aware of these actions at the time.

Rosen reported that Katz stated that he employed predominantly women because women could be paid less than men.

Additionally, in an interrogatory response, Abeita stated that:

> In other instances, I complained and accused defendant Katz of discriminating when he refused to consider someone for a promotion. I complained and accused defendant Katz of discriminating when he discouraged me from hiring a male as my assistant. I complained and accused defendant Katz of discriminating when I challenged the fact that throughout his history with defendant company he did not seriously consider hiring females for executive positions. I complained and accused defendant Katz of discriminating by encouraging the hiring of females so that he could pay them less and control them more.

Abeita also states that Katz did not follow and discounted her advice because she was a woman. According to Abeita, Katz also said that the plaintiff was "sick" because she worked so hard, but did not apply such a characterization to hard-working males. Abeita also asserts that Katz kept his salary promises to similarly situated males but did not keep his promise to Abeita.

TransAmerica fired Abeita on June 3, 1993. At the time of the firing, according to Abeita, Katz cited only "continuity of management" as the reason. Her firing followed negotiations between Abeita and Katz about her salary. Abeita claims that Katz reneged on salary promises throughout her tenure at TransAmerica and she requested payment for what she believed TransAmerica owed to her.

TransAmerica suffered a business downturn starting in 1991. TransAmerica's gross sales decreased from $75 million to $40 million in 1993. TransAmerica's workforce declined from 330 full and part-time personnel in 1991 to 214 full and part-time personnel by October of 1993. In March of 1993, TransAmerica fired Richard E. Culp, a Vice President at TransAmerica, in order to reduce overhead costs.

After her termination, Abeita filed a discrimination charge with the EEOC. Abeita checked the box covering sex discrimination, but did not check the box indicating that she had a retaliation claim. She did not mention retaliation in her description of her claim. She filed suit in the District Court, and after discovery, the defendants moved for summary judgment. The District Court granted summary judgment on all three of Abeita's claims discussed in turn below, and dismissed without prejudice plaintiff's state law claims.

## II. Discussion

■ We review a district court's grant of summary judgment de novo. *See Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). We must view the facts and all inferences drawn from the facts in the light most favorable to the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When confronted with a properly-supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. Hostile Environment Claim

■ Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) and *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295

(1993), the Supreme Court held that hostile environment harassment violated Title VII. The *Meritor* Court stated that "for sexual harassment to be actionable, it must be sufficiently severe or pervasive to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" 477 U.S. at 67, 106 S.Ct. 2399 (alteration in original) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)).[5]

Recently in *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997), our court further explored the issue of what conduct constitutes hostile environment harassment after *Harris:*

> The *Harris* Court explained that the conduct in question must be judged by both an objective and a subjective standard: The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive. [510 U.S. at 21–22, 114 S.Ct. 367]. "This standard ... takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." [*Id.* at 21, 114 S.Ct. 367] Acknowledging that this approach is not susceptible to a "mathematically precise test," [*id.* at 22, 114 S.Ct. 367], the Court then sought to provide some guidance with regard to whether a work environment was objectively hostile or abusive. The Court explained that all of the circumstances should be considered, and it suggested a non-exhaustive list of relevant factors:
>
>> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether

it unreasonably interferes with an employee's performance....

[*Id.* at 23, 114 S.Ct. 367].

*Black*, 104 F.3d at 826; *see also, e.g., Baskerville v. Culligan Internat'l Co.*, 50 F.3d 428 (7th Cir.1995) (overturning a jury verdict in favor of the plaintiff because it found that the sexual statements at issue were insufficient to support a finding of an objectively hostile work environment); *but see, e.g., Smith v. Norwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1413–15 (10th Cir.1997) (holding that defendant employee's statements were sufficient to establish a hostile environment). In addition, the court in *Black* noted that "verbal conduct alone can be the basis of a successful hostile work environment claim." 104 F.3d at 826. The *Black* court also stated that "[w]hile we emphasize that sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII, we note that in this case most of the statements were not directed at plaintiff; this fact contributes to our conclusion that the conduct here was not severe enough to create an objectively hostile environment." *Id.* The *Black* court analyzed the "totality of the circumstances" rather than analyze the comments as independent events. *See id.* (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367).

The *Black* court applied its *Harris*-derived standard and held that the defendant's verbal conduct was not objectively hostile or abusive as a matter of law. In *Black*, over a period of four months, the defendant employees made allegedly sexually harassing comments at meetings held every two weeks where eight of the ten participants were men. *See id.* at 823. These comments included: "Nothing I like more in the morning than sticky buns" stated directly to the plaintiff; statements at multiple meetings that a land development adjacent to a Hooters Restaurant should be named "Hootersville,"

---

**5.** To establish a hostile environment claim in this Circuit, a plaintiff must show that: "(1) she is a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonable interfered with her work performance and created a hostile work environment; and (5) [the defendant] 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate

corrective action.'" *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998) (quoting *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 50 (6th Cir.1996)). The analysis of whether the alleged harassment is "sufficiently severe of pervasive to 'alter the conditions of [the victim's] employment and create an abusive working environment'" falls under the fourth element above.

"Titsville," or "Twin Peaks;" a statement by her immediate supervisor that the plaintiff was "paid great money for a woman" after the plaintiff asked about her bonus; laughter at the plaintiff after she mentioned her negotiations to purchase land from a Dr. Busam, apparently pronounced "bosom" followed by more "jokes" about the "Hootersville" land; a statement by the President of the defendant company after the plaintiff inquired about the location of a piece of property that it was near a biker bar and "[s]ay, weren't you there Saturday night dancing on the tables?"; and a statement in the context of a discussion about getting a county official to sign a document to "[j]ust get the broad to sign it." *Id.* at 823–24.

▮▮▮ The District Court in the instant case held that Abeita's evidence of harassment was no stronger than the evidence presented in *Black.* The District Court's analysis omits the plaintiff's claim that Katz's sexual comments were "commonplace," "ongoing," and "continuing." This omission is critical because, as the District Court found, the specific statements made by Katz in the presence of Abeita and recounted by Abeita appear to be of approximately equal *severity* to those found in *Black.* Only one of the statements was about Abeita—the yellow dress, yellow shoes, yellow underwear statement—and it does not appear objectively much more hostile than the "sticky buns" or "dancing on tables" statements in *Black.* The rest of the specific sexual and gendered statements by defendant Katz concerned women other than the plaintiff, and appear to be of approximately equal severity as those found in *Black.* If these specific statements were the only ones that plaintiff alleged occurred over her nearly seven years of employment, we would agree with the District Court that made over a period of years these specific statements were neither so severe nor so pervasive that a reasonable person could find a hostile work environment.

However, plaintiff's assertion that comments like these were commonplace, ongoing, and continual establishes that the statements were more pervasive or widespread than the ones made in *Black.* While statements about models' attributes are to be expected as part of the job in view of the nature of plaintiff's employment, Katz's remarks about his sexual interest in female employees and models went beyond what was job related. Unlike *Black,* the comments here were not the banter of a group. Plaintiff's inability to recount any more specific instances goes to the weight of her testimony, a matter for the finder of facts. Also, Katz, the President of TransAmerica, made all of the statements at issue here and the plaintiff worked with Katz on a daily basis. These factors can be considered in determining whether the conduct was severe and help to distinguish the instant case from *Black.* For these reasons, we cannot say that plaintiff is unable to present sufficient evidence of a hostile environment to submit her claim to the fact finder. We reverse the District Court's grant of summary judgment on plaintiff's hostile environment claim.

### B. Disparate Treatment Claims

Plaintiff also makes two gender-based disparate treatment claims—that she was fired because of her gender and that the defendants did not fulfill salary promises made to her because of her gender. The District Court granted summary judgment to the plaintiff on these claims because the plaintiff failed to establish a prima facie case of discrimination. Because we agree that plaintiff failed either to establish a prima facie case of discrimination or to produce any direct evidence of discrimination, we affirm this grant of summary judgment.

▮▮▮ Title VII of the Civil Rights Act of 1964 prohibits an employer from "discharg[ing] any individual, or otherwise ... discriminat[ing] against any individual with respect to his compensation ... because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). Thus, plaintiff can prevail against her employer if she can establish that her employer either fired her or did not fulfill a salary promise to her because of her sex. In other words, plaintiff prevails if she shows disparate treatment because of her sex. Plaintiff can avoid summary judgment on her disparate treatments claims here by showing either that gender directly played a role in the employment decision, *see, e.g.,*

*Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d·268 (1989) (evaluating stereotypical statements made during deliberations on and explanations of a decision not to promote), or by presenting evidence that raises an inference of discrimination. *See Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 348 (6th Cir.1997) ("[A] plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination."). Because plaintiff did not produce any evidence that gender directly played a role in the decision to fire her and the alleged decision to not fulfill salary promises made to her, Abeita has failed to establish disparate treatment through the direct, *Price Waterhouse* route. We now turn to Abeita's attempts to create an inference of discrimination.

■ Plaintiff can raise an inference of discrimination, or, in other words, establish a prima facie case of discrimination, in one of two ways: (1) by establishing the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), prima facie case elements, or (2) by showing the existence of facts which create an inference of discrimination, *see Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1248 (6th Cir.1995) ("[A] plaintiff may establish a prima facie case of discrimination ... by showing the existence of facts which create an inference of discrimination." (internal citations omitted)).

■ The plaintiff failed to establish a prima facie case under *McDonnell Douglas.* To establish a *McDonnell Douglas* prima facie case, the plaintiff must show that: (1) plaintiff was a member of a protected class; (2) plaintiff suffered an adverse employment action; (3) plaintiff was qualified for the position; and (4) plaintiff was replaced by a person outside the protected class. *See, e.g., Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992). Plaintiff here fails on the fourth element because after she was fired, her responsibilities were split between a number of female TransAmerica employees. Abeita tries to overcome the evidence that she was replaced by women by arguing that TransAmerica and Katz originally planned to replace her with a man, but then decided not to in order to improve their litigation position against Abeita. Abeita's deposition testimony does not support this assertion. In her deposition, Abeita states that shortly before she was fired Katz told her that TransAmerica had made an offer to a man, Jeffrey Giesener, who "could" perform Abeita's position. Abeita specifically says that Katz did not state that this man *would* perform Abeita's job functions. Considering that Abeita had stated earlier in the same conversation with Katz that she was considering looking for other employment, Katz's statement that Giesener "could" perform Abeita's job requirements does not indicate that TransAmerica planned to replace Abeita with a man after she was fired. Because Abeita points to no other evidence that supports her assertion that TransAmerica planned to hire a man to replace her, her argument fails.

■ Plaintiff also failed to present other evidence that would permit an inference that TransAmerica fired her and broke salary promises to her because of her gender. In her attempt to establish such evidence, plaintiff points to her assertion that Katz did not follow and discounted her advice because of her gender. Specifically, plaintiff stated that Katz asked plaintiff's immediate supervisor for his opinion on plaintiff's advice and Katz did not ask for second-opinions when he received advice from male employees. Plaintiff does not provide any specific instances of Katz following advice from similarly situated male employees without checking this advice with their supervisors. In her deposition, she conceded that she did not know what Katz said to male employees in response to their suggestions. Absent any evidence showing that male and female employees were treated differently, we do not accept the fact that Katz bounced plaintiff's advice off of plaintiff's supervisor as evidence of gender discrimination. Plaintiff also concedes that Katz followed her advice at times without asking for another opinion.

Abeita also asserts that TransAmerica and Katz kept salary promises to similarly situated males but did not keep their promises to her. Neither in her testimony nor otherwise

**254**

in the record is there support for this assertion. In one deposition response, she states that she "believes" that TransAmerica and Katz fulfilled a salary promise to a male employee. However, earlier in her deposition she testified about conversations with this same male employee about how Katz had *not* fulfilled salary promises to him. Additionally, she stated that she was not sure whether the promise concerned salary or compensation.

Finally, plaintiff asserts that TransAmerica predominantly employed women because it was easier to keep women at lower pay levels than men. However, this allegation does not support Abeita's claims that she was fired or Katz did not fulfill salary promises to her because of her gender. Abeita does not claim that her salary was less than those of similarly situated men working at TransAmerica.

Because the plaintiff fails to establish a *McDonnell Douglas* prima facie case, other evidence supporting an inference of discrimination, or direct evidence of gender playing a role in the decisions to fire her and not to fulfill salary promises to her, we affirm the District Court's grant of summary judgment to the defendant on plaintiff's disparate treatment claims.

### C. Retaliation Claim

Abeita's retaliation claim fails because the District Court did not have jurisdiction to hear the claim after Abeita failed to file it before the EEOC. We review de novo the legal question behind a dismissal for subject matter jurisdiction; "[w]e review a district court's factual findings in a dismissal for lack of subject matter jurisdiction only for clear error." *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 544–45 (6th Cir.1991). Federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be

expected to grow out of the EEOC charge. *See id.* Retaliation claims are generally excepted from this filing requirement because they usually arise after the filing of the EEOC charge. *See id.* at 546–47. However, this exception to the filing requirement does not apply to retaliation claims based on conduct that occurred before the EEOC charge was filed. *See id.* at 547.

In her EEOC complaint, the plaintiff neither checked the retaliation box nor described anything that indicates that she might have a retaliation claim.[6] In her lawsuit, plaintiff asserts that she was fired in response to her complaints to defendant Katz concerning her salary and his sexual comments. All of the alleged retaliation occurred before she filed her EEOC charge. Thus, the District Court correctly dismissed plaintiff's retaliation claim for lack of subject matter jurisdiction.

### D. Discovery Issue

Plaintiff argues that the District Court erred by not ordering the defendant Katz to hand over his individual tax returns to the plaintiff. The plaintiff argues that these tax returns are likely to indicate that defendant Katz received substantial disbursements from TransAmerica during the same time period that the defendants argue that the company's sales and workforce were shrinking.

Because we hold that Abeita has failed to establish either a prima facie case of gender discrimination or direct evidence of gender discrimination, we need not reach this issue because this evidence is only relevant, if at all, at the pretext stage of the *McDonnell Douglas* analysis.

### III. Conclusion

For the preceding reasons, we affirm the grant of summary judgment on plaintiff's disparate treatment claims and affirm the

---

6. In her EEOC charge, plaintiff stated: "I was hired by Respondent in 1986. On June 3, 1993, I was discharged. During the course of my employment, I was harassed because of my gender and was offered different terms and conditions of employment than were similarly situated males. I was told that I was being discharged for continuity of management. I was not given a reason why I was treated differently from similarly situated males. I believe that I was treated differently than males, harassed, and discharged because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended."

dismissal of plaintiff's retaliation claim. We reverse the grant of summary judgment on plaintiff's hostile environment harassment claim, reverse and reinstate plaintiff's state law claims, and remand for further proceedings consistent with this opinion.