**Toni HUDSON, Plaintiff,**

v.

**M.S. CARRIERS, INC., Defendant.**

No. 01–2576 B.

United States District Court,
W.D. Tennessee,
Western Division.

Nov. 7, 2003.

Daniel L. Johnson, Memphis, TN, for Plaintiff.

David M. Rudolph, Martin, Tate, Morrow & Marston, Memphis, TN, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BREEN, District Judge.

### INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff, Toni Hudson, filed a complaint pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* on July 23, 2001 against her employer, M.S. Carriers, Inc. ("M.S.Carriers"), alleging sexual harassment and retaliation. Plaintiff's employment was subsequent terminated and on July 19, 2002 she filed a second Title VII action alleging that her termination was in retaliation for her previous complaints. *Hudson v. M.S. Carriers, Inc.,* No. 02–2568–D/V (W.D.Tenn.). On October 22, 2002, District Judge Bernice B. Donald issued an order consolidating plaintiff's two cases under case number 01–2576.

On November 1, 2002, the defendant filed a motion for summary judgment as to all claims. Subsequently, Hudson's attorney withdrew and plaintiff was afforded an extension of time to respond to the motion.

The case was reassigned to the undersigned on March 21, 2003. Plaintiff, proceeding *pro se,* filed a response to the summary judgment motion on April 28, 2003 and a supplemental response on June 25, 2003. Counsel was later appointed to represent the plaintiff and filed on her behalf a supplemental response in opposition to the summary judgment motion on October 10, 2003.

### SUMMARY JUDGMENT STANDARD

Rule 56(c) provides that a

... judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. at 1356. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a prepon-

derance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. In this circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action." *Lord v. Saratoga Capital, Inc.*, 920 F.Supp. 840, 847 (W.D.Tenn.1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989)). The "judge may not make credibility determinations or weigh the evidence." *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir.1994).

## *UNDISPUTED FACTS*

The following facts are undisputed unless otherwise indicated. The plaintiff was hired by the defendant trucking company on October 7, 1993. (Compl. at ¶¶ 4, 7; Affidavit of Jeff Autry at ¶ 4.) At some point thereafter, she was promoted to Safety Service Leader ("SSL"), a supervisory position. (Autry aff. at ¶ 4.) As an SSL, Hudson was the direct supervisor and dispatcher for between 35 and 60 truck drivers. (Autry aff. at ¶ 5; Affidavit of Toni Hudson at ¶ 3.)

Defendant contends that, at the request of Lease–Purchase Manager Claude Watkins, Hudson was transferred in March 1999 to the Lease–Purchasing Department. (Autry aff. at ¶ 6.) Plaintiff, however, insists that the transfer was effected at her request. (Hudson aff. at ¶ 3.) According to the defendant's version of events, the plaintiff's immediate supervisor following the transfer was Team Leader Ronnie Rushing, who, in turn, reported to Watkins. (Autry aff. at ¶ 7.) The plaintiff maintains on the other hand that Watkins was in fact her immediate supervisor at the time of the transfer[1]. (Hudson aff. at ¶ 4.)[2] It is apparently undisputed by the plaintiff that she began experiencing job performance difficulties in November 1999 under Rushing and on November 15, 1999 received a formal written warning for failure to maintain data integrity. (Autry aff. at ¶ 8 & Ex. A.) It is also undisputed that the defendant had a sexual harassment policy and complaint procedure in place at the time the actions complained of occurred. (Autry aff. at ¶ 9 & Ex. B.)

Hudson has alleged in her complaint that, "[b]eginning in September 1, 1999 and continuing, plaintiff has been continuously subjected to sexual harassment by the manager of Lease Purchasing," that is, Watkins. (Compl. at ¶ 7.) She further submits that "[s]he has reported this behavior on two (2) separate occasions to the Hu-

---

**1.** The plaintiff's also seems to take issue with the circumstances of her transfer. In particular, Ms. Hudson states, in her unsworn response, that she "bid[ ] on the day SSL Monday through Friday position from the computer. After plaintiff accepted the position, Claude Watkins demoted plaintiff from grade 18 to grade 17, took her supervisor's code and gave it to a white female." Pl. Br. at 2. The alleged demotion and the racial discrimination implied in plaintiff's response are not at issue here, since the complaint is limited to allegations of sexual harassment. Moreover, although the March 12, 1999 personnel action form to which plaintiff refers,

*id.*, Ex. B, does indeed show that plaintiff's salary grade was reduced from 18 to 17, that document also indicates that plaintiff's salary was increased from $34,200.40 to $34,883.98 as a result of a $683.58 merit increase.

**2.** Resolution of this factual conflict is not necessary, since it is undisputed that Mr. Watkins was at least plaintiff's second-line supervisor. However, two of the personnel action forms submitted by the plaintiff list Mr. Watkins as the person to whom the plaintiff reports. Pl. Br., Ex. B.

man Resource Department and yet the behavior continued." (Compl. at ¶ 8.) Defendant contends that Hudson first voiced her complaints about Watkins to Autry in January of 2000, at which time she provided Autry with a handwritten log documenting four specific acts of a sexual nature that she considered inappropriate:

a. On October 6, 2000, Mr. Watkins allegedly asked Ms. Hudson what kind of panties she had on. On that same day, Mr. Watkins allegedly told Ms. Hudson about an incident when he went to a strip bar and swiped the stripper's rear end with his credit card.

b. On November 30, 2000, Mr. Watkins allegedly called Ms. Hudson into his office to show her his "fake penis," which was apparently a pencil. Mr. Watkins allegedly put the "fake penis" close to his private area.

c. On December 1, 2000, Mr. Watkins allegedly took off his shoe and touched Ms. Hudson with his feet under her desk.

d. On December 10 and 13, 2000, Mr. Watkins again allegedly took his shoes off and touched Ms. Hudson's feet.[3]

(Autry aff. at ¶ 10 & Ex. C.) Hudson claims that in November the number of trucks she handled was reduced, resulting in her inability to qualify for bonuses. (Hudson aff. at ¶ 8.) The plaintiff also avers in her affidavit that Watkins struck her on the shoulder on February 18, 2000 and that

during this time period on occasions that I did not document, Watkins engaged in other harassing conduct which included wetting his finger and sticking it in my ear, and in response to me asking why he did these things, his response was that he wanted to "make oreo cookies."

I understood him to mean he desired sexual intercourse. There were numerous other instances when he touched me in an offensive and unwanted manner. (Hudson aff. at ¶ 6(f).)

While proceeding *pro se* prior to the appointment of her current counsel, the plaintiff provided to the court the affidavits of co-workers Charlotte Rawls Hill and Kay Mosley. Hill stated that Watkins demoted Hudson, asked her to climb onto a truck so that he could see her underwear, inquired as to whether her panties matched her shirt, and grabbed her shoulder as she walked past him. In an affidavit submitted contemporaneously with her *pro se* response to the motion for summary judgment, the plaintiff averred that the truck incident occurred in November 1999. Neither this affidavit nor the affidavit of Hudson submitted with her final supplemental response following appointment of counsel mentioned the remaining events enumerated by Hill. Mosley related in her affidavit that on one occasion Hudson returned from lunch to find her stuffed animal hanging over her desk. She offered no additional details concerning the surrounding circumstances, the identity of the perpetrator or the timing of the occurrence.

Autry conducted an investigation of the complaints, which included interviews with Watkins, Rushing and the plaintiff. Watkins, who had been with the company since its inception and who had not had sexual harassment allegations leveled at him before, denied Hudson's claims. Rushing supported Watkins' denial of wrongdoing. It is the contention of M.S. Carriers that the plaintiff made her complaint shortly after she had been disciplined by Rushing for poor performance and did not produce witnesses in support of her allegations. (Autry aff. at ¶ 11.) Plaintiff insists that

3. According to the plaintiff, these actions actually occurred in 1999.

she offered the names of three persons, Charlotte Hill, Kay Mosley and Patrician Barbeo, who witnessed the acts of sexual harassment. (Hudson aff. at ¶ 12.) Based on its investigation, the employer determined there was insufficient evidence, to discipline Watkins. (Autry aff. at ¶ 11.)

According to the defendant, Autry, on February 18, 2000, offered to transfer Hudson to a regular line haul SSL position without loss of pay in order to remove her from Watkins' area. She refused, electing instead to remain in Watkins' department. (Autry aff. ¶ 12.) The plaintiff posits on the other hand that "it was discussed" that she accept a transfer to the regular line "but no such offer was actually made." (Hudson aff. at ¶ 13.)

In March 2000, Hudson went on medical leave for 26 weeks, during which she was paid her full salary per company policy. (Autry aff. at ¶ 14.) The plaintiff avers that her health problem at this time consisted primarily of depression. (Hudson aff. at ¶ 7.) M.S. Carriers acknowledges, and Hudson apparently does not dispute, that, while the plaintiff was on medical leave, the defendant forwarded to her a separation notice dated March 31, 2000 after she failed to return Autry's telephone calls and provide medical certification for her absences. The separation was rescinded, with no loss of pay or benefits, after communication between the parties had been recommenced and the necessary documentation submitted. (Autry aff. at ¶ 15.) Plaintiff does not dispute that, upon her return, she could work only part-time for four hours per day. (Autry aff. at ¶ 16.) The defendant maintains that, as it did not have a part-time SSL position, the plaintiff was offered a full-time SSL job, but refused because of her physician's recommendation that she work part-time. (Autry aff. at ¶ 16.) The only part-time position available at that time was in the proof of delivery department, where Hud-

son worked on a temporary basis from September 5 to 28, 2000 at $10.00 per hour. (Autry aff. ¶ 17.) Upon release by her doctor to work full-time, the plaintiff was placed in a full-time SSL position similar to the one she held prior to taking leave and which paid her previous salary. (Autry aff. at ¶ 18.)

Afterward, the plaintiff again became ill. Defendant also contends that she experienced job performance difficulties and that management requested that she be reassigned until her medical problems were addressed. (Autry aff. at ¶ 19.) M.S. Carriers maintains that, as her sick leave had been exhausted, the employer created a temporary position for Hudson in the human resources department that paid $10 per hour. (Autry aff. at ¶ 20.) The defendant planned to have an independent medical assessment conducted in order for the company to determine whether she could be returned to full duty or processed for long-term disability. According to M.S. Carriers, Hudson declined to have the assessment performed and returned to her former position as an SSL on February 5, 2001. (Autry aff. at ¶ 20.) Hudson has denied that she refused to participate in the assessment. (Supplemental Resp. to Summ. J., Aff. of Toni Hudson at ¶ 23.) Hudson returned to work for a short time and then went out again on short-time disability for six months upon her requalifying for such benefits in March 2001. (Autry aff. at ¶ 21.)

M.S. Carriers contends that it was acquired by Swift Transportation Co. in June 2001 and, as a consequence, changed its sick pay/short-term disability program to match that of the new parent company. The employer also claims that, after August 1, 2001, the plaintiff was not entitled to additional sick pay under the new policy. (Autry aff. at ¶ 22.) In September 2001, Hudson notified her employer that

she wished to return to work. The defendant submits that it had no SSL positions available at that time and that it had no duty to restore Hudson to her former position as her leave time had long been exhausted. Nonetheless, plaintiff was permitted to interview for other company positions for which she was qualified. (Autry aff. at ¶ 23.) It is the defendant's contention that, when the plaintiff declined to interview for the positions, she was terminated. (Autry aff. at ¶ 23.) Hudson maintains that, when she was discharged, she was informed that no jobs were available when in fact such was not the case. (Hudson aff. at ¶ 10.)

## ARGUMENTS OF THE PARTIES AND ANALYSIS

■ The defendant first argues that summary judgment is appropriate as the plaintiff has failed to show that the alleged harassment by Watkins was sufficiently severe and pervasive to support a Title VII discrimination claim. Title VII prohibits actions on the part of an employer "on the basis of sex that 'discriminate[s] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270, 121 S.Ct. 1508, 1509, 149 L.Ed.2d 509 (2001), *reh'g denied* (June 11, 2001) (quoting 42 U.S.C. § 2000e–2(a)(1)). A plaintiff may establish a violation of Title VII, as Hudson seeks to do here, by showing that the alleged discrimination based on sex created a hostile working environment. *See Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir.1999), *reh'g and suggestion for reh'g en banc denied* (Sept. 30, 1999). A hostile working environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift*

*Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal citations and quotation marks omitted); *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir.2000) (citing *Harris*). As the Supreme Court has articulated, "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998); *see also Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir.2003).

■ Courts are instructed to "determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787–88, 118 S.Ct. at 2283 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. at 371) (internal quotation marks omitted). Only that sexual harassment that is "so 'severe or pervasive' as to alter the conditions of the victim's employment and create an abusive working environment violate Title VII." *Id.* at 786, 118 S.Ct. at 2283 (internal quotation marks omitted).

■ On the other side of the coin, the statute does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). Nor do "simple teasing, offhand comments, and isolated incidents (unless extremely serious) ... amount to discriminatory changes in the

terms and conditions of employment." *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283 (internal citations and quotation marks omitted). The Supreme Court cautioned in *Faragher* that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.....We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment ..." *Id.*, 118 S.Ct. at 2283–84 (internal quotation marks omitted).

In support of its position, the defendant refers the court to two opinions from this Circuit: *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir.2000), *reh'g and suggestion for reh'g en banc denied* (Mar. 3, 2000) and *Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir.), *cert. denied*, 531 U.S. 928, 121 S.Ct. 307, 148 L.Ed.2d 246 (2000). In *Morris*, the plaintiff worked for a county road department and performed secretarial duties. *Morris*, 201 F.3d at 786–87. Her supervisor often told jokes with sexual overtones, once called the plaintiff "Hot Lips," and several times commented on her clothing. *Id.* at 787. He also intimated that the plaintiff could improve her evaluation ratings by performing sexual favors. *Id.* Although the county judge ordered him not to communicate directly with the plaintiff and to not be around her without a third person present, the supervisor visited her worksite 15 times; telephoned her on some 30 occasions; drove by and parked outside her workplace several times, looking into her window and making faces at her; destroyed the television she watched at work; threw roofing nails on her driveway; and on one occasion followed her home, pulled his vehicle alongside her mailbox and gave her "the finger." *Id.*

The court found that the only actions that could be considered "because of sex" consisted of the "Hot Lips" reference, the dirty jokes told in plaintiff's presence, isolated comments concerning dress, and the alleged verbal sexual advance relative to the plaintiff's performance evaluation. The court determined that, while the sexual advance was "truly offensive," it was the only one made. The remainder of the supervisor's alleged behavior was, in the court's view, "the kind of simple teasing, offhand comments, and isolated incidents that *Faragher* made clear did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment." *Id.* at 790, 118 S.Ct. 2275. Thus, it was the court's conclusion that, based on the facts before it, the plaintiff could not establish she was subjected to a hostile working environment. *Id.*

In *Burnett*, the alleged harasser, the plant personnel manager, walked into a meeting and began telling a story about a woman he had seen recently. As he talked, he placed a pack of cigarettes containing a lighter inside the plaintiff employee's tank top and bra strap. At another meeting two weeks later, during which the plaintiff began coughing, the same manager handed her a cough drop and said "[s]ince you have lost your cherry, here's one to replace the one you lost." *Burnett*, 203 F.3d at 981. Some five months later, during the Christmas season, plaintiff wore a sweater to work that read "Deck the Malls." As she walked past the personnel manager, he stated "Dick the malls, dick the malls, I almost got aroused." *Id.* The court held that, under the totality of the circumstances, the single act of placing the cigarette package under plaintiff's bra strap—even if that act constituted battery—did not, coupled with two "merely offensive remarks over a six-month period," create an issue of material fact as to whether a hostile environment existed. *Id.* at 984–85.

In arguing that the facts of this case support a conclusion that Watkins' conduct created a hostile environment, the plaintiff, conversely, draws the court's attention to the Sixth Circuit's determinations in *Williams* and *Abeita v. TransAmerica Mailings, Inc.,* 159 F.3d 246 (6th Cir.1998), *reh'g and suggestion for reh'g en banc denied* (Dec. 23, 1998). In *Williams,* the plaintiff, a female employee at General Motors' Delphi–Packard plant, alleged 15 instances of sexually harassing behavior. She contended that she overheard a coworker, Don Giovannoe, say "hey slut" as she approached; her supervisor, Pat Ryan, looked at her breasts and said "you can rub up against me anytime" and "you would kill me, Marilyn. I don't know if I can handle it, but I'd die with a smile on my face"; Ryan came up behind her and said "Back up; just back up" or "You can back right up to me"; Ryan put his arm around her neck, leaned his face into hers, and said, while she was seated at her desk writing "Hancock Furniture Company" on a piece of paper, that "You left the dick out of the hand"; and that she came in for her shift to find a box of forms glued to her desk; heard Giovannoe say "I'm sick and tired of these fucking women"; had boxes thrown at her by Giovannoe; was denied overtime, a key to the office, breaks and permission to sit at the table at the window of the tool crib where she worked; and was padlocked in the crib by a female co-worker. *Williams,* 187 F.3d at 558–59.

The court concluded that, even though the individual acts did not rise to the level of a Title VII violation, the actions directed at the plaintiff when viewed in their totality raised a question as to whether Williams was subjected to a hostile environment. *Id.* at 564. The court went on to hold that "non-sexual conduct can constitute harassment 'based on sex' " as "*[a]ny* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." *Id.* at 565 (emphasis in original). Accordingly, the court found that "[t]he myriad instances in which Williams was ostracized, when others were not, combined with the gender-specific epithets used, such as 'slut' and 'fucking women,' create[d] an inference, sufficient to survive summary judgment, that her gender was the motivating impulse for her co-workers' behavior." *Id.* at 565–66.

The plaintiff in *Abeita* alleged that the male president of the company for which she worked, Avrum Katz, made sexual comments to her throughout her employment, which spanned seven years, claiming that he indicated his desire to have sex with certain female employees and models in a manner that was "ongoing," "commonplace" and "continuing." *Abeita,* 159 F.3d at 248–49. She also alleged that her employer made comments in her presence that, while not sexual, were degrading to overweight women. He did not make similar statements concerning overweight males. *Id.* at 249. Albeita further averred that Katz remarked to her as follows: "oh, yellow dress and yellow shoes, yellow underwear too?" *Id.* at 248. In holding that summary judgment in favor of the employer should be denied, the court emphasized the commonplace, ongoing and continual nature of Katz's comments and the fact that he was the company president, with whom the plaintiff worked on a daily basis. *Id.* at 252.

Although not cited by the parties, the court finds notable in rendering its decision on the instant motion the Circuit court's decision in *Bowman.* In that case, the plaintiff, a male athletics instructor, claimed harassment at the hands of his female supervisor, alleging, among other things, that she briefly rubbed his shoulder, chastized him for missing classes

when he did not, forcing him to apologize for failing to attend a party thrown by one of her friends, accusing him of lying, calling him at home, and insisting that he work during the summer without pay. *Bowman,* 220 F.3d at 458–59. The plaintiff also made the following allegations:

> At a 1992 Christmas party, Bowman was leaning against the stove in Jahnke's house when Jahnke grabbed his buttocks. Bowman turned around and told Jahnke that if someone were to do that to her she would fire him or her. Jahnke replied that "she controlled [Bowman's] ass and she would do whatever she wanted with it."
>
> In the spring of 1994, Bowman went to Jahnke's house to repair her deck, which took approximately an hour to fix. Jahnke, excited because she would be able to use the whirlpool on the deck, told Bowman "[l]et's get it finished, you and I can try [the whirlpool] out together."
>
> In the summer of 1994, Jahnke invited Bowman and his girlfriend to her house to go swimming in her pool. After a short period of time, Bowman decided to leave, at which point Jahnke commented to him that "[n]ext time, you know, you ought to come by yourself and enjoy yourself."

*Id.* at 459.

In affirming the district court's grant of summary judgment to the defendant, the Sixth Circuit found that, unlike the plaintiff in *Williams,* Bowman had failed to demonstrate that the non-sexual conduct of which he complained had anything to do with his gender, albeit intimidating and insulting. *Id.* at 464. The court went on to state that, while the allegations concerning the Christmas party, the whirlpool and the swimming pool were serious, they did

> not constitute conduct that is pervasive or severe. We note that like *Williams,* three of the alleged incidents in this case

were not merely crude, offensive, and humiliating, but also contained an element of physical invasion. However, the conduct in this case is not nearly as severe or pervasive as the harassment in *Williams* or in other cases where the court found that the conduct in question was not severe or pervasive enough to constitute a hostile environment [citing *Burnett* and *Morris* ].

*Id.* (internal citations and quotation marks omitted).

■ Upon reviewing the facts of this case in the light most favorable to the plaintiff, the court finds that, under the totality of the circumstances, Watkins' behavior, while boorish, was not sufficiently severe or pervasive to survive summary judgment. The actions of Hudson's supervisor—the question about her underwear; the stripper story; and the pencil, foot and Oreo cookies incidents—hardly rise to the level of the 15 separate allegations of sexual harassment present in *Williams* or the commonplace, ongoing and continual comments endured by the plaintiff in *Abeita.* Nor was the conduct alleged here as severe or pervasive as the defendants' actions in *Bowman, Morris,* or *Burnett,* where the court found summary judgment in favor of the defendant appropriate. Moreover, the fact that some of the incidents alleged, including Hudson's contention that Watkins struck her, involved physical invasion does not in and of itself militate a finding of hostile environment. Consequently, defendant's motion for summary judgment as to plaintiff's claim of sexual harassment is GRANTED.

The court now turns to Hudson's retaliation claim. In her supplemental response to the motion for summary judgment, the plaintiff couches this claim as one for retaliatory harassment, citing *Morris,* in which the Sixth Circuit held that, in order to

establish a prima facie case of Title VII retaliation, a plaintiff must show that

(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris,* 201 F.3d at 792.

Once the plaintiff has established a prima facie case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 381 (6th Cir.2002). If the employer carries its burden of production, the presumption raised by the plaintiff's prima facie case is rebutted. Plaintiff must then prove, by a preponderance of the evidence, that the employer's stated reasons for the employment action were pretextual. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 518–19, 113 S.Ct. 2742, 2753–54, 125 L.Ed.2d 407 (1993). The ultimate burden of persuasion remains at all times with the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

■ The plaintiff claims that M.S. Carriers retaliated against her by (1) reducing her bonus potential, (2) wrongfully terminating her; (3) decreasing her pay from $18.00 per hour to $10.00, and (4) terminating her even though jobs were available

within the company.[4] The court will consider each of these allegations seriatim. With respect to the alleged reduction in bonus potential, the plaintiff makes reference to the statement in her affidavit that "in November, 1999, the number of trucks [she] handled was reduced so that I could not make bonuses." (Hudson aff. at ¶ 8.) It is undisputed that Hudson did not complain about events she claims constituted sexual harassment until January 2000. As the alleged adverse employment action occurred *prior to* the protected action—that is, complaining about harassment—it is axiomatic that no causal connection can be established between the complaint and the reduction in bonus potential.

■ Plaintiff next complains that M.S. Carriers retaliated against her by sending the termination letter, which was later rescinded. In order to satisfy the third prong of the retaliation claim, Hudson must "show a significant change in her employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, a significant change in benefits, or other factors unique to her particular situation." *Akers,* 338 F.3d at 497–98. As she admits receipt of all pay and benefits due her during that period and alleges no other change in her status due to the mistaken termination, plaintiff's allegation in this regard is insufficient to sustain a retaliation claim.

■ As to her eventual termination, the plaintiff asserts that in September 2001 when she returned to work after medical absence she was informed no work was available for her, which was untrue. According to the defendant, there was no available SSL position and it had no duty

---

4. In her affidavit, the plaintiff states that "Defendant acted in reckless disregard for my health condition, when it allowed two unidentified men to come to my house and show me gruesome pictures of a dead woman, apparently in relation to a murder investigation." (Hudson aff. at ¶ 11) The court will not consider this allegation, however, as there is no evidence whatever to support the plaintiff's contention that M.S. Carriers was responsible for the incident.

under the Family and Medical Leave Act to restore her to her former position, which had already been filled.[5] M.S. Carriers also submits that it offered Hudson the opportunity to interview for other positions within the company for which she was qualified and, when she declined to do so, she was fired.

In order to satisfy the causation prong of the retaliation claim, a plaintiff "must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct." *Weigel,* 302 F.3d at 381 (citing *Johnson v. University of Cincinnati,* 215 F.3d 561, 582 (6th Cir.2000)) (internal citations and quotation marks omitted). In viewing the evidence presented in the light most favorable to Hudson, the court finds nothing whatsoever to support such an inference. Rather, the evidence points solely to the conclusion that the plaintiff's termination arose from her medical problems and extensive absences. At bottom, the plaintiff's position is that, because she suffered discrimination and at some point thereafter lost her job, the discharge must have been retaliatory. Such circular reasoning is simply not sufficient to establish a Title VII violation.

Even assuming that plaintiff has made out a prima facie case of retaliatory harassment, the defendant may prevail on its motion for summary judgment if it can articulate a non-discriminatory reason for its disputed action, which Hudson cannot demonstrate was pretextual. In relation to the plaintiff's allegation concerning decrease in pay, M.S. Carriers submits that the plaintiff was placed in the proof of delivery position paying $10.00 per hour upon her return from her initial 26–week medical leave because it was the only part-time position available. It is undisputed that the plaintiff's physician ordered her to work limited hours.

At this point, the *McDonnell Douglas* paradigm requires the plaintiff to show evidence that the defendant's stated reason had no basis in fact, did not actually motivate the decision or was not sufficient to motivate the employer's action. *See Manzer v. Diamond Shamrock Chem. Co.* 29 F.3d 1078, 1084 (6th Cir.1994), *reh'g and suggestion for reh'g en banc denied* (Sept. 22, 1994). While Hudson states in her affidavit that the company employed part-time "floaters" to fill in for other employees, she has offered no evidence to suggest that any floater positions were available or that they paid more than $10.00 per hour. Nor has she presented evidence from which a reasonable factfinder could infer that the stated reason did not motivate or was not sufficient to motivate M.S. Carriers' decision to place her in the proof of delivery position. Thus, she has failed to establish pretext.[6]

## CONCLUSION

For the reasons articulated herein, the defendant's motion for summary judgment is hereby GRANTED. Accordingly, the Clerk of Court is directed to enter judgment in favor of the defendant and any remaining pending motions are DENIED as moot.

---

5. The court need not consider whether M.S. Carriers indeed had a duty to restore Hudson to her previous position, as the plaintiff has not alleged a violation of the Family and Medical Leave Act.

6. It appears to the court from reviewing the pleadings that the plaintiff does not allege that the transfer to the part-time job in the human resources department at $10.00 per hour was retaliatory.