NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0049n.06

No. 08-6376

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LOUVENIA ARMSTRONG; HENRY BEASLEY; )
LARSEN CASH; TIM SWADER; BETTY TALLEY, )
                             )
      Plaintiffs-Appellants, )
                             )
and                             )
                             )
GEORGE OBI, et al.,            )
                             )
      Plaintiff, )
                             )
          v. )
                             )
WHIRLPOOL CORPORATION,    )
                             )
      Defendant-Appellee. )
                             )

**FILED**
**Jan 26, 2010**
LEONARD GREEN, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

BEFORE:  KENNEDY and ROGERS, Circuit Judges, and HOOD, District Judge.[*]

    **ROGERS, Circuit Judge.**  Five African-American plaintiffs appeal the district court's grant of summary judgment for defendant Whirlpool with respect to their claims that racial harassment at a Whirlpool facility in La Vergne, Tennessee, created a hostile work environment.  Henry Beasley and Larsen Cash, plaintiffs whose employment at Whirlpool was terminated following their depositions in this case, also appeal the district court's grant of summary judgment for Whirlpool

_____

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

on their retaliation claims.  The district court granted summary judgment for Whirlpool on the hostile work environment claims of Louvenia Armstrong, Betty Talley, Beasley, and Cash by finding that those plaintiffs had not created a fact question as to whether their work environments were objectively hostile.  The district court determined that Tim Swader had created a fact question as to whether his work environment was hostile but granted summary judgment for Whirlpool by concluding that Whirlpool could not be held liable for that environment.  The district court also determined that Whirlpool was entitled to summary judgment with respect to Beasley and Cash's retaliation claims because there was no genuine issue of material fact as to whether Whirlpool's legitimate reason for the terminations—misconduct surrounding a supervisor's notebook that Cash found on the factory floor and that Beasley later concealed from Whirlpool—was merely pretext.

Armstrong, Beasley, and Cash have raised a fact question as to whether their work environments were objectively hostile by alleging that racial harassment was ongoing, commonplace, and continuous at the Whirlpool facility and by providing specific examples of racial harassment sufficient for a court to judge the objective severity of the harassment.  In addition, they allege other instances of racial harassment sufficient to allow a reasonable finder of fact to determine that racial harassment was so severe and pervasive as to alter the terms of employment for these three plaintiffs.  Their cases are remanded to the district court for further proceedings consistent with this determination.

Talley has not raised a fact question as to whether her work environment was hostile because she has not alleged harassment severe and pervasive enough to establish a genuine issue of material

fact as to whether racial harassment at the La Vergne facility altered the conditions of her employment. Swader's appeal is limited to asking this court to consider evidence of discrimination of which Swader was not aware, and such evidence is not relevant to a hostile work environment claim at the summary judgment stage. Beasley and Cash's retaliation claims fare no better, because neither plaintiff has created a fact question as to whether Whirlpool's stated justification for the terminations was merely pretext. Whirlpool is entitled to summary judgment with respect to the claims of Swader and Talley, and with respect to the retaliation claims of Beasley and Cash.

**I.**

Seven current and former African-American employees of Whirlpool initially brought this action alleging a hostile work environment as a class, on behalf of current, former, and future African-American Whirlpool employees. In March of 2007, the district court denied the Plaintiffs' Motion for Class Certification, and the plaintiffs then pursued their claims individually. Each of the plaintiffs alleged a racially hostile work environment in violation of Title VII, and all of the plaintiffs made specific factual allegations of discrimination that they had either witnessed or learned of during their employment at the Whirlpool facility. Additionally, all of the plaintiffs made general allegations of racial harassment that the plaintiffs had neither witnessed nor learned of outside the context of this litigation. Beasley and Cash added retaliation claims after both were terminated following their depositions.

**A. Louvenia Armstrong**

Louvenia Armstrong has been employed at the La Vergne Whirlpool facility since 1984. In support of her hostile work environment claim, Armstrong alleged that racial harassment by Dale Travis, a co-worker and union steward, was "an ongoing thing every day that we had to listen to." During her deposition, Armstrong stated that Dale Travis used the words "ni****" and "uppity ni****" frequently, that Travis would call African-American employees "white boys," that she heard Travis say that African Americans should stay with their own kind, and that Travis was generally "just cussing and making jokes, you know, about blacks." She also alleged that she had heard a co-worker whose name she could not recall refer to African Americans as lazy, use the phrase, "may the klan be with you," and state that "he was going to tell his KKK buddies about—about us." Armstrong stated in her deposition that another co-worker constantly referred to her as "gal," a term with racist connotations, and that she did not know of any other employees with whom the co-worker used that term. Armstrong also stated that on one occasion a number of Caucasian workers wore pins bearing the image of the Confederate flag, and that on another occasion a Caucasian supervisor threw out a cake that an African-American employee had made. Although Armstrong did not ever witness racist graffiti in the plant personally, she did allege that she had learned that there was racist graffiti at the plant. In addition to these allegations of racial harassment, Armstrong's complaint contains numerous allegations of racial harassment that she neither witnessed nor learned of except by reason of this litigation.

**B. Betty Talley**

Betty Talley has been employed by Whirlpool in a variety of positions since 1984. Like her co-plaintiffs, Talley described several alleged instances of racial harassment that she neither witnessed nor learned of except by reason of this litigation. Additionally, Talley stated that Dale Travis "would curse, on the line anybody and everybody," and that she complained to a supervisor about "how [Travis] would walk off the line and how he yelled and nobody did anything about it." Talley stated that Travis "did his stuff on a daily basis." Although Talley stated during her deposition that she had neither heard another employee call an African-American employee a racially offensive name at work nor been called a racially offensive name at work herself, she later testified that she had witnessed Travis address another employee by saying, "hey you black mother fu****," and that she had heard Travis call Henry Beasley an "uppity ni****." She also stated that Travis had once used the phrase, "may the klan be with you," and that Travis had said that "we needed a James Earl Ray Day" and that African Americans should stay with their own kind. Additionally, Talley testified that she had learned second-hand that Travis had called Beasley a "yellow ni****" and a "redhead ni****," and that Travis had said that Beasley wanted to be white. Talley also claimed to have learned second-hand that Travis called a co-worker a "black bitch." Finally, Talley claimed that she had heard Travis refer to co-workers who spoke with her as "ni**** lovers."

In discussing her complaints about employees other than Travis, Talley stated that a Caucasian employee named Quiggle had "talked about any race that wasn't white" and had "told dirty jokes" in the presence of supervisors who had done nothing in response. Additionally, Talley stated that during the period in which she worked in the warehouse, she would often observe graffiti

on the inside of trailers that she unloaded, although she did not know whether the trailers belonged to Whirlpool. Specifically, she observed the letters "KKK," and the word "ni**** bitch," as well as sexually explicit drawings with racial components, in the inside of trailers that she unloaded. She also stated that her supervisor would spray paint over the graffiti as soon as it appeared.

## C. Henry Beasley

Henry Beasley was employed at Whirlpool's La Vergne facility from 1984 until 2006, when he was terminated for violations of company policy several days after his deposition in this case. In support of his hostile work environment claim, Beasley, like his co-plaintiffs, urges the court to consider incidents of racial harassment that he neither witnessed nor learned of outside the context of this litigation. Beasley also relies heavily on continuous harassment by Dale Travis, who "said something racially offensive anytime, almost, he opened his mouth." Beasley testified that Travis once had asked Beasley whether he thought there should be a James Earl Ray Day, and that Travis had called African-American employees "ni****" and "white boy," and other derogatory terms. Beasley stated that although Travis had improved his behavior temporarily after Beasley had reported Travis to a supervisor, Travis had gone "right back to it."

In addition to his deposition testimony concerning Travis, Beasley testified to other incidents at the plant. He stated that he had once heard two co-workers laughing and saying that an African-American man who had been dragged to his death behind a pick-up truck in Texas "probably deserved it." Beasley stated that the restrooms at the Whirlpool facility were full of racist graffiti and that they always had been, and he provided photographs showing graffiti including the letters

"KKK." He further testified that he had complained about this graffiti in 2003 or 2004, but that it had not been removed until July of 2005, after the commencement of this lawsuit. He also asserted that he had observed a spare truck with graffiti showing the image of a person with a rope around his neck, and that he was aware that an African-American employee had once found manure on a truck that she used during her shift. Beasley testified that supervisors and co-workers regularly made racist jokes, including jokes about O.J. Simpson and Rodney King.

In addition to this hostile work environment claim, Beasley added a claim for retaliatory discharge after Whirlpool terminated his employment for violations of company policy with regard to a supervisor's notebook that Cash claimed to have found on the floor and that Beasley later concealed from Whirlpool. Some time before his deposition, Beasley began an email correspondence with Whirlpool Director of Human Resources Fred Contreras, claiming that he knew Whirlpool was keeping notes on him. Beasley met with Contreras and told Contreras that he had factual evidence of the surveillance. At that meeting and in an email afterwards, Contreras asked for more information about the source of Beasley's information, but Beasley stated that he "just knew." Contreras responded that Beasley's vague statements had "prevented [Contreras] from more fully understanding [Beasley's] concerns." Whirlpool first learned of the notebook during Beasley's deposition, when Whirlpool's attorney asked about Beasley's claims that Whirlpool was monitoring him. Beasley testified that he had known he was being monitored partly because "we found some information . . . that the supervisor was keeping notes on us." When asked who that supervisor was, Beasley stated that it was Bill Westberry. Beasley also stated that Cash had given him the notebook

and that Cash had claimed to have found it on the factory floor. Beasley felt that the notebook was evidence of animosity towards him for his participation in the lawsuit because it contained notes on his actions in the factory, but the notebook also contained notes on a number of other Whirlpool employees, both Caucasian and African American.

Several days after his deposition, Beasley was terminated for violations of company policy. To support the termination, Whirlpool relied on a rule allowing for "immediate termination for either dishonesty or hiding a co-worker's property." Beasley filed a grievance, and an independent arbitrator found that the termination was justified because Beasley had taken a co-worker's property and had lied about it not only to management, but also at his deposition and in the context of the arbitration hearing itself. Beasley then added this claim for retaliatory discharge.

## D. Larsen Cash

Larsen Cash was employed at the La Vergne Whirlpool facility from 1986 until 2006, when he was terminated several days after his deposition in this case. Like his co-plaintiffs, Cash made numerous allegations of racial harassment that he neither witnessed nor learned of outside the context of this litigation. He also relied heavily on harassment by Dale Travis. According to Cash, Travis was "going around using the word ni**** all the time," and would taunt African-Americans by "hollering real loud, hey, white boy, hey white boy, and that was [on] a daily basis." Cash also stated that he had heard Travis say that "white people had better watch out, there's a bunch of ni***** taking over." Cash testified during his deposition that he had personally complained about

Travis and knew that others had also done so, but that nothing had ever been done about the complaints or Travis' behavior.

According to Cash, supervisors addressed him by the name "boy" or "big boy" on at least two occasions. He also testified that one supervisor had constantly referred to African-American men as "boys." Cash stated that he had heard second-hand that a manager had said of an African-American employee, "that's my ni****, ain't that right boy? That's my ni****." Cash also heard that when an African-American employee had baked a cake for a Caucasian employee, the Caucasian employee had thrown the cake in the trash and had "said he didn't want no cake no ni**** had made." Cash heard that a co-worker called an African-American employee a sand head or a rag head. Additionally, Cash testified that a Caucasian group leader had called African-American women "ni*****," and had said "Dale [Travis] does it, why can't I?"

Cash also testified that he had observed racially offensive graffiti in the plant, and in speaking of the graffiti shown in Beasley's pictures, Cash said, "this stuff right here has been on the wall for 19 years that I've been there." Cash stated that he recalled seeing the words "rag heads" and "sand ni*****" on the wall, and the phrases, "wish all you ni***** would go back . . . we made mistake . . . bringing you over here," and "I wish we could have a James Earl Ray Day so we could all get off for killing that ni****," in addition to other derogatory statements that he could not recall. Cash testified that he had complained about this graffiti on several occasions.

During his deposition, Cash also discussed the supervisor's notebook that Whirlpool had learned of during Beasley's deposition. Cash claimed that he had found the notebook lying on the

factory floor and had decided to give it to Beasley, rather than to a supervisor or to his lawyer. When asked why he had not returned the notebook, Cash stated that he had not returned it because it had notes on Cash and Beasley, and because he had not known whose property it was. Later in his deposition, however, Cash indicated that he that he knew the notebook belonged to his supervisor, Bill Westberry, but had not returned the notebook because "it was notes on me." Like Beasley, Cash was terminated shortly after his deposition and submitted a grievance before an independent arbitrator. The arbitrator upheld Whirlpool's decision to terminate Cash for violations of company policy, and Cash added a claim for retaliatory discharge.

**E. Tim Swader**

Tim Swader has been employed at the Whirlpool facility in La Vergne for seventeen years. In support of his hostile work environment claim, Swader alleges numerous incidents of racial harassment that he either witnessed or learned of outside of the context of this litigation. Like his co-plaintiffs, Swader also urges this court to consider incidents of racial harassment that he neither witnessed nor learned of except by reason of this litigation—evidence the district court excluded from the hostile work environment inquiry.

**F. The District Court Opinion**

Whirlpool moved for summary judgment on all claims by all of the plaintiffs. In support of its motion for summary judgment on the hostile work environment claims, Whirlpool argued that the plaintiffs had failed to raise a genuine issue of material fact that they were subjected to an objectively hostile work environment, and alternatively, that the plaintiffs had failed to establish a

genuine issue of material fact as to Whirlpool's liability for the plaintiffs' work environment. The district court concluded that Armstrong, Talley, Beasley, and Cash had not created a fact question as to whether their work environments were objectively hostile. In reaching this conclusion, the district court excluded all evidence of discrimination that the individual plaintiffs had not either witnessed or learned of except by reason of this litigation. The court analyzed the remaining allegations of harassment and concluded that the harassment was not severe and pervasive enough to create a genuine issue of material fact as to whether the plaintiffs' work environments were objectively hostile. Because of this finding, the district court did not determine whether the plaintiffs had created a fact question as to whether Whirlpool could be held liable for the harassment alleged by Armstrong, Talley, Beasley, and Cash, and the parties did not brief that issue before this court.

The district court determined that Swader had created a fact question as to whether he was subjected to a hostile work environment, but the court granted summary judgment for Whirlpool by concluding that Swader had not created a fact question as to whether Whirlpool could be held liable for that work environment. The court based its conclusion that Swader had experienced a hostile work environment on two incidents in particular. Both involved harassment and threats directed at Swader personally by Travis and another employee identified as "Willie," and both resulted from Swader's relationship with a Caucasian female at the facility. The district court found that Whirlpool could not be held liable for the harassment Swader had alleged because Swader had never reported Willie's conduct and each time Swader had reported Travis to a supervisor that supervisor

had spoken with Travis. The district court also noted that Travis had been terminated shortly after the third time Swader had reported Travis.

In concluding that Whirlpool was entitled to summary judgment with respect to Beasley and Cash's retaliation claims, the district court found that Beasley had not created a fact question as to whether Whirlpool's legitimate reason for terminating him was pretext. Beasley did not contest the independent arbitrator's decision that he had hidden a co-worker's property in violation of company policy and had lied about it to management and at his deposition. The district court found that Cash had not demonstrated that Whirlpool's stated reason for terminating him was pretext because he had not contested either that a company rule providing for termination when an employee acts dishonestly or hides a co-worker's property existed, or that his conduct had violated that policy.

The district court entered an order granting summary judgment for Whirlpool on all claims on September 30, 2008. Armstrong, Talley, Swader, Beasley, and Cash filed this timely appeal.

**II.**

To establish a prima facie case of a racially hostile work environment, a plaintiff must demonstrate that (1) the plaintiff was a member of a protected class; (2) the plaintiff was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *Barrett v. Whirlpool Co.*, 556 F.3d 502, 515 (6th Cir. 2009). No one disputes that each of the plaintiffs was a member of a protected class, was subject to some unwelcome harassment, and that the harassment was based on race. Thus,

in granting summary judgment for Whirlpool, the district court focused on whether the plaintiffs had raised a fact issue as to whether they were subjected to hostile work environments and, if so, whether Whirlpool could be liable for those environments.

In determining whether a plaintiff was subjected to a hostile work environment, the trier of fact must examine the totality of the circumstances. *Id.* To be actionable, the racially offensive conduct must be "sufficiently severe or pervasive to 'alter the conditions of (the victim's) employment and create an abusive working environment.'" *Jackson v. Quanex*, 191 F.3d 647, 658 (6th Cir. 1999) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)). Although the Supreme Court in *Harris v. Forklift Systems, Inc.* guided lower courts to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," 510 U.S. 17, 23 (1993) , the inquiry is not subject to any precise mathematical test. *Abeita v. Transamerica*, 159 F.3d 246, 251 (6th Cir. 1998). "Simple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). In order to change the terms and conditions of employment, the discriminatory "conduct must be extreme." *Id.* For this reason, the question of whether a plaintiff suffered a hostile work environment involves both an objective component that asks whether a reasonable person would find the environment hostile and abusive, and a subjective component that asks whether the individual plaintiff subjectively viewed that environment as abusive. *Jackson*, 191 F.3d at 658.

**A. Louvenia Armstrong, Henry Beasley, and Larsen Cash**

Armstrong, Beasley, and Cash alleged sufficient racial discrimination to create a fact question as to whether that discrimination was severe and pervasive enough to create a hostile work environment. In asserting their claims, the plaintiffs each relied on commonplace, ongoing, and continuous harassment by Dale Travis, in addition to other incidents involving other employees. Even though much of Travis' harassment was directed at African Americans in general, rather than the plaintiffs personally, this court held in *Abeita* that a plaintiff had created a fact issue on her hostile work environment claim based on her allegations that the president of her company had made sexual and gendered statements towards women and that those remarks were commonplace, ongoing, and continuous, even though only one of those comments had been directed at the plaintiff. 159 F.3d at 252. Armstrong alleged that Dale Travis' racial harassment was "an ongoing thing every day that we had to listen to." She stated that Travis had "used the word ni\*\*\*\* a lot and uppity ni\*\*\*\*." She also alleged that she had heard Travis say that people should stay with their own kind, that he would call African-American employees "white boy," and that he was "just cursing and making jokes, you know, about blacks." As a result, Armstrong stated that she had complained two or three times per week about Travis' racial harassment. Beasley also alleged that Travis had made comments that were "explicit, racist, and hostile and threatening towards blacks." Beasley stated that Travis had "said something racially offensive any time, almost, he opened his mouth," and alleged that those offensive statements had included asking Beasley personally whether there should be a James Earl Ray Day and calling African Americans "white boys" and "ni\*\*\*\*." Beasley had reported Travis

to a supervisor, but according to Beasley, Travis "went right back to it." Cash made similar allegations. He alleged that Travis "was going around using the word 'ni****' all the time." Cash stated that he had heard that Travis had told other white employees to watch out, "there's a bunch of ni***** taking over." Although Cash stated in his deposition that he personally had complained about Travis and knew others had done so also, Travis allegedly continued his harassing behavior. As this court stated in the gender harassment context, "more weight should be given to acts committed by a serial harasser if the plaintiff knows that the same individual committed offending acts in the past. This is because a serial harasser left free to harass again leaves the impression that acts of harassment are tolerated at the workplace . . ." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 337 (6th Cir. 2008).

In addition to their claims of serial harassment by Dale Travis, Armstrong, Beasley, and Cash also alleged other facts similar to those alleged by the plaintiff in *Jackson*. In that case, this court held the plaintiff had created a fact question as to her hostile work environment claim by alleging that she had been subjected to an abundance of racial epithets and racial graffiti and had suffered other harassment that, although not racial in nature, would not have occurred but for her race. 191 F.3d at 662. The court rejected the notion that a court should "exclude from its consideration virtually all of the incidents of racial harassment established by [a plaintiff] on the grounds that they (1) were not directed at [the plaintiff] or did not occur in [the plaintiff]'s presence, (2) did not involve overt racial overtones, or (3) were so commonplace at Quanex that they became, to the district court, 'conventional conditions on the factory floor.'" *Id.* at 659. In holding that the

plaintiff had established a fact issue on her hostile work environment claim, this court also rejected the "extremely narrow view of workplace harassment . . . in which every single member of a protected class would have to suffer a series of affronts both explicitly racial and personal in nature before she could claim the existence of a hostile work environment." *Id.* at 659-60.

Like the plaintiff in *Jackson*, Armstrong, Beasley, and Cash all alleged to have seen or known about racial graffiti at the Whirlpool plant. Beasley took six pictures of the graffiti, and one of those pictures showed graffiti with the letters "KKK." Cash alleged that he had viewed graffiti in the restrooms at the Whirlpool plant for nineteen years, including graffiti about rag heads, sand ni*****, and the statements, "wish all you ni***** would go back . . . we made a mistake . . . bringing you over here," and "I wish we could have a James Earl Ray Day so we could all get off for killing that ni****." Although Armstrong stated that she had not personally observed any racist graffiti at the plant, she did state in her deposition that she had learned of the presence of the racist graffiti during her time at the plant.

In addition to the constant harassment by Travis and the racist graffiti at the plant, Armstrong, Beasley, and Cash also alleged numerous other incidents sufficient to establish a fact question as to whether their work environments were hostile. Armstrong testified that on one occasion a number of Caucasian employees had worn pins bearing images of the Confederate flag to work, that she was constantly called "gal" by a coworker, and that she had heard that a supervisor had thrown out a birthday cake baked by an African-American employee. In addition to his testimony about Travis and the racist graffiti in the Whirlpool restrooms, Beasley stated that he had heard two employees

laughing and saying that a man who was dragged to his death behind a pick-up truck in Texas "probably deserved it," that an African-American employee had found human feces on the truck she used during her shift, and that Beasley had once observed a spare truck bearing an image of a person with a rope around his neck. Cash stated that on two occasions supervisors had called him "boy" and "big boy" and that one supervisor had constantly referred to African-American men as boys. Cash had also heard that a Caucasian manager had told an African-American supervisor that the supervisor was the manager's ni****, that a supervisor had thrown away a cake baked by an African-American employee because he "said he didn't want no cake no ni**** had made," and that a supervisor had called an African-American employee a "sand head" or "rag head" and another Caucasian employee had said that "all ni***** were lazy." These incidents, combined with the ongoing harassment by Travis and the allegations of racist graffiti at the Whirlpool facility, create a fact question as to whether Armstrong, Beasley, and Cash experienced discrimination severe and pervasive enough to alter the conditions of their employment.

Whirlpool argues that this court should exclude the plaintiffs' allegations of continual racist conduct by Travis because each of the plaintiffs recalled only a few specific incidents to support their allegations that Travis' conduct was continuous, based on this court's decision in *Ladd v. Grant Trunk Western Railroad*, 552 F.3d 495 (6th Cir. 2009). We stated in *Ladd*, "[The plaintiff] has alleged that she was subject to derogatory sex-based comments on a daily basis, but without specifics it is difficult to adjudge their severity. [The plaintiff] herself said that they did not rise to the level that she needed to complain about them." *Id.* at 501. Thus, the court's decision to decision to affirm

summary judgment for the employer despite allegations of daily racial harassment was based on its need to "understand the objective severity of the comments [the plaintiff] had to put up with on a daily basis." *Id.* at 501 n.3. Armstrong, Beasley, and Cash have all provided enough specific examples of the harassment by Dale Travis for the court to judge the objective severity of those comments, and each plaintiff had reported Travis' conduct. There is no issue as to the severity of the remarks made by Dale Travis in this case. When a plaintiff alleges commonplace, ongoing, and continuous harassment and provides specific examples of that harassment sufficient for a court to judge the objective severity of that harassment, a "[p]laintiff's inability to recount any more specific instances [of discrimination] goes to the weight of her testimony, a matter for the finder of facts." *Abeita*, 159 F.3d at 252.

Armstrong, Beasley, and Cash have created a fact question as to whether the discrimination they alleged was severe and pervasive enough to interfere unreasonably with their work performance by creating an intimidating, hostile, or offensive work environment. Therefore, their cases are remanded to the district court for consideration of whether they have raised a question of fact as to Whirlpool's liability for their hostile work environments.

**B. Betty Talley**

Talley has not created a fact question as to whether her work environment was objectively hostile. Talley alleged serious racial discrimination that she had either witnessed or learned of second-hand, but this discrimination does not rise to the level of an objectively hostile work environment because it was not so severe and pervasive as to alter the conditions of Armstrong's

employment. Talley's claims are similar to those of Armstrong, Beasley, and Cash, but they differ in at least two important respects. First, Talley's allegations concerning the harassment by Dale Travis are more general than those of her co-plaintiffs. Although she did allege that "Dale did his stuff on a daily basis," Talley's allegations of continuous harassment concerned "bad language" and "cussing in general" directed at all employees, rather than specific racial harassment of African-American employees. Second, although Talley also alleged that she personally had observed racist graffiti on the inside of trailers she unloaded during her employment, she also testified that this graffiti had been painted over each time as soon as she reported it to her supervisor. The district court correctly classified Talley's allegations of discrimination as a "handful of uses of the n-word and its derivatives, primarily by Travis, some racist jokes by Quiggle, a few references by Travis to the Ku Klux Klan and James Earl Ray, and the presence of racist graffiti that was removed as soon as [Talley] reported it to a supervisor." *Armstrong v. Whirlpool*, No. 3:03-cv-01250, 2008 WL 4525413, at *6 (M.D. Tenn. Sept. 30, 2008). Even considering these incidents together in the totality of the circumstances of which Talley was aware, the alleged harassment was not severe or pervasive enough to alter the conditions of Talley's employment.

Talley argues that Whirlpool's actions in immediately removing the graffiti from inside the trailers Talley unloaded are relevant only to Whirlpool's liability—an issue the district court did not reach—rather than to the question of whether Talley's work environment was objectively hostile. Although Whirlpool's response to the graffiti does impact the question of Whirlpool's liability, the length of time graffiti is allowed to remain in a facility—and the degree of an employees's

subsequent exposure to that graffiti—has a necessary impact on the determination of the severity and pervasiveness of the harassment. A plaintiff's daily exposure to graffiti allowed to remain in the workplace indefinitely, such as the graffiti Beasley and Cash alleged existed in the Whirlpool restrooms for nearly two decades, implicates more severe and pervasive harassment than graffiti that was immediately painted over. A comparison can be drawn to allegations of harassment by a serial harasser that are objectively severe because they give the impression that the employer tolerates harassment in the workplace. Thus, Talley's claim of limited exposure to graffiti that was removed as soon as it was reported is fundamentally different from the allegations that graffiti was allowed to remain in the workplace for nearly two decades and that was removed only after the commencement of this lawsuit.

Talley contends, along with her co-plaintiffs, that this court should consider all of the harassment alleged at the Whirlpool facility in assessing whether each plaintiff was subject to an objectively hostile work environment, regardless of whether the individual plaintiffs were aware of that discrimination. The district court properly excluded such evidence from its consideration, however, because this court has stated on numerous occasions that such evidence is not relevant to a plaintiff's hostile work environment claim. In *Abeita*, this court refused to consider evidence of sexual harassment against a plaintiff's coworkers in determining whether the plaintiff's hostile work environment and disparate treatment claims were sufficient to survive summary judgment. 159 F.3d at 249 n.4. The plaintiff in that case provided evidence of boorish behavior towards women by three of her coworkers, but the court refused to consider the evidence, stating, "[t]his evidence is irrelevant

at this stage to plaintiff's hostile environment and disparate treatment claims because there is no evidence that plaintiff was aware of these actions at the time." *Id.* Although the court's discussion of the matter was limited to a footnote in the fact section, the court's decision was directly relevant to its consideration of the plaintiff's hostile environment and disparate treatment claims. *Id.*

This court has affirmed this principle in several recent cases. Most recently, in *Barrett v. Whirlpool*, a 2009 decision involving the same Whirlpool facility at issue here, we held that "comments or conduct of which a plaintiff had no knowledge cannot be said to have made her work environment hostile." 556 F.3d at 515. In *Hawkins v. Anheuser-Busch, Inc.*, this court reviewed Sixth Circuit case law addressing other-act evidence and held that the case law "makes clear that we can consider evidence of other acts of harassment *of which a plaintiff becomes aware* during the period [of] his or her employment, even if the other acts were directed at others and occurred outside the plaintiff's presence." 517 F.3d 321, 335 (6th Cir. 2008) (emphasis added). We discussed *Abeita* and the court's decision to reject evidence of discriminatory behavior of which the plaintiff was unaware during her employment. *Id.* Although both *Abeita* and *Hawkins* involved hostile work environment claims in the gender discrimination context, this court reviews race and gender based discrimination claims under similar standards. *Jackson*, 191 F.3d at 658.

This court's decision in *Abeita* is consistent with the underlying purposes of the hostile work environment inquiry. In *Harris*, the Supreme Court explained that claims based on a hostile work environment must be judged by both an objective and a subjective standard. 510 U.S. at 21-22. It is the objective aspect of this test upon which Talley and her co-plaintiffs rely in asserting that the

- 21 -

district court erred in refusing to credit evidence of harassment not known to the plaintiffs individually. But in *Harris*, the Supreme Court formulated the objective part of the inquiry not as addressing whether an objectively hostile work environment existed beyond the plaintiff's knowledge, but instead as asking whether a reasonable person would find the discriminatory conduct hostile or abusive. 510 U.S. at 21-22. In discussing the objective standard, the Court in defining an objectively hostile work environment, took "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* at 21. Thus, the Court's focus in the objective part of the inquiry is on determining what type of conduct would actually "alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotations and citations omitted).

Although Talley alleged that she did witness some harassment of African-American employees, the incidents of discrimination she has alleged do not create a question of fact as to whether racial harassment during her more than two decades at the Whirlpool facility was so severe and pervasive as to alter the conditions of her employment. Whirlpool is therefore entitled to summary judgment with respect to Talley's hostile work environment claim.

## C. Tim Swader

The district court determined that Swader had created a fact question as to whether his work environment was objectively hostile, but Swader has not appealed the district court's basis of the district court's decision—the court's holding that Swader had not created a fact question as to whether Whirlpool could be held liable for Swader's hostile work environment. The appellants'

brief contains just two paragraphs concerning Swader individually, under the heading "Appellant

Swader's Hostile Environment Claim Must Be Remanded for Reconsideration of All of the

Evidence." The first paragraph concerning Swader summarizes the district court's holding that

Swader had created a fact issue as to whether he suffered a hostile work environment, but that

Swader had not created a fact issue as to whether Whirlpool could be held liable for that

environment. The second paragraph, which discusses the basis of Swader's appeal, contains just

three sentences:

> Swader contends, however, that his allegations of racially offensive language and
> graffiti alone—the allegations of Swader's co-Appellants to which the lower court
> refers in its Opinion—considered in the context of the racially hostile environment
> present at the LaVergne facility can by itself support a finding of a severe and
> pervasive hostile work environment. This includes the conduct of which Appellee
> was aware but to which it did not respond. Swader's hostile work environment claim
> must be remanded with his co-Appellants for consideration of all the evidence of
> racial harassment present at the LaVernge facility.

Nothing in this statement indicates an appeal of the district court's holding that Whirlpool

could not be held liable for Swader's hostile work environment on the basis of the evidence of racial

harassment that the district court did consider. Thus, Swader has not challenged the basis of the

district court's holding.

To the extent that Swader did intend to challenge the basis of the district court's holding by

requesting that this court consider additional evidence relevant to the determination of whether

Swader's work environment was objectively hostile, thereby enlarging the amount of racial

harassment for which Whirlpool was potentially liable, that appeal fails because Swader has not

pointed to any relevant evidence of harassment improperly excluded by the district court. As discussed in relation to Talley's claim, the district court correctly excluded evidence of discrimination that Swader neither witnessed nor learned of outside the context of this litigation. Thus, the decision of the district court granting summary judgment for Whirlpool on Swader's hostile work environment claim is affirmed.

## III.

Whirlpool is entitled to summary judgment with respect to Beasley and Cash's retaliation claims because, as the district court concluded, neither Beasley nor Cash established that Whirlpool's stated reasons for their terminations—misconduct surrounding a supervisor's notebook that Cash claimed to have found on the factory floor and that Beasley later concealed from Whirlpool—was merely a pretext for retaliation, and because Beasley and Cash's actions in concealing their possession of the notebook were not protected activity. In addressing retaliation claims, we have held that when a defendant produces a non-discriminatory reason for a termination in response to a plaintiff's prima facie case of retaliation, the "burden of production shifts back to the plaintiff to demonstrate that the proffered reason was merely pretext." *Ladd*, 552 F.3d at 502. In order to show that an employer's stated reason for terminating an employee was merely a pretext for retaliation, the employee must show that the non-discriminatory reason for the termination had no basis in fact, that it did not actually motivate the employer's decision to terminate the employee, or that it was insufficient to motivate the decision to terminate the employee. *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 662 (6th Cir. 1999). Neither Beasley nor Cash has met this burden. Beasley and Cash

attempt to show that their misconduct in concealing the notebook was insufficient to motivate their terminations not by contesting that they did not act in violation of company policy, but instead by arguing that Whirlpool failed to apply its progressive discipline policy uniformly. Because Beasley and Cash have failed to show that Whirlpool declined to terminate other similarly-situated employees for conduct of comparable seriousness, and because Beasley and Cash's remaining arguments are without merit, Whirlpool was entitled to summary judgment with respect to the retaliation claims.

Beasley and Cash argue that Whirlpool's continued employment of Dale Travis for thirteen years, despite numerous reports of racist behavior and violations of Whirlpool's policy against harassment, establishes that Whirlpool failed to apply its progressive discipline policy in a uniform manner. A terminated employee may show that an employer's stated reason for a retaliatory discharge was insufficient to motivate termination by producing evidence that other employees "were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Lamer v. Metadyne Co. LLC*, 240 Fed. App'x 22, 31 (6th Cir. 2007). However, Travis was not engaged in "substantially identical" conduct to that of Beasley and Cash, who were terminated for withholding the company property of another employee and concealing their possession of that property from Whirlpool. Although Travis was allowed to remain at Whirlpool for thirteen years despite numerous allegations of reports of racial harassment, the entire theory underlying Beasley and Cash's hostile work environment claims is that Whirlpool did not, in fact, treat racial harassment of African-American employees by Travis and

others as serious misconduct. The connection between racial harassment and the violations of company policy for which Beasley and Cash were terminated is too tenuous to establish a question of fact as to whether Beasley and Cash's misconduct in concealing their possession of the notebook was insufficient to warrant termination.

Beasley and Cash argue that even if they cannot show that Whirlpool's stated reason for the terminations was merely pretext, they cannot be terminated for concealing the notebook from Whirlpool because the notebook contained evidence that "Whirlpool had increased surveillance of them and other employees for participating in this lawsuit," and Beasley and Cash's withholding of the notebook was therefore activity protected under Title VII. However, Beasley and Cash's actions involving the notebook are not protected activity because those actions did not involve participation in a Title VII proceeding, and because those actions were not *reasonable* opposition to any Title VII discrimination. Title VII generally prohibits retaliatory conduct when an employee has participated in an investigation, hearing, or proceeding under Title VII, or when an employee has otherwise opposed discrimination made unlawful under Title VII. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 719-720 (6th Cir. 2008). Beasley and Cash were part of a lawsuit alleging violations of Title VII at the time they discovered the notebook, but their actions in concealing the notebook from Whirlpool are not participation in that lawsuit because their claims that the notebook was evidence relate to retaliation claims—claims that Beasley and Cash did not assert until they were terminated for concealing the notebook. *See id.* at 721-722. Moreover, although an "individual's delivery of relevant documents during the discovery process or the giving of testimony at a deposition clearly

falls within the ambit of participating 'in any manner' in a Title VII proceeding," *id.* at 722, concealing confidential company documents, threatening an employer with those documents, and refusing to fully disclose those documents to an attorney or return them to the company are not parts of the discovery process. Beasley and Cash's actions in concealing the notebook were not participation in a proceeding brought under Title VII.

Beasley and Cash's terminations are not protected activity under Title VII's opposition clause because their actions in concealing the notebook were not reasonable under the circumstances. The protection afforded under Title VII's opposition clause is significantly less than that afforded under the participation clause. *Id.* at 720. To determine whether an employee's opposition of unlawful discrimination constitutes conduct that is protected under Title VII, we have employed a balancing test to balance "the employer's recognized, legitimate need to maintain an orderly workplace and to protect confidential business and client information, and the equally compelling need of employees to be properly safeguarded against retaliatory actions." *Id.* at 722. "The ultimate question under the balancing test is whether the employee's [actions were] reasonable under the circumstances." *Id.* at 725. Here, although the court can assume for summary judgment purposes that Cash acquired the notebook innocently by finding it on the factory floor, his actions were not reasonable because he gave the notebook to another employee rather than confront Whirlpool or provide the notebook to his attorneys, and he later gave conflicting answers as to why he did not return the notebook to Whirlpool. Cash first stated that he did not return the notebook because he did not know to whom it belonged, but he later admitted that he knew the notebook belonged to his supervisor but refused

to return it because "it was notes on me." Once Beasley had possession of the notebook, he refused to return the notebook to Whirlpool or his attorneys, and even concealed his possession of the notebook. He also made vague threats to Whirlpool, claiming that he "just knew" Whirlpool was watching him. Beasley eventually provided his attorneys with a single page from the notebook, but even then he did not disclose the entire notebook, which contained a supervisor's personnel notes on many employees at the facility, not just those participating in the lawsuit. Because Beasley and Cash's actions were not reasonable opposition to discrimination made unlawful by Title VII, their conduct was not protected activity.

*Kempcke v. Monsanto Co.*, 132 F.3d 442 (8th Cir. 1998), is not to the contrary. In that case, the plaintiff discovered documents in a computer assigned to him and confronted his supervisor with those documents. *Id.* at 445-46. When the plaintiff was unsatisfied with the supervisor's explanations, the plaintiff gave the documents to his attorney and told the supervisor that the supervisor could deal with the plaintiff's attorney to discuss the issue of whether the documents should be returned. *Id.* The Eighth Circuit stated in that case that the plaintiff "confronted his supervisor with [the] documents and requested an explanation. That is clearly protected activity." *Id.* at 445. The court held that termination is unlawful based on a plaintiff's withholding of documents that "have been innocently acquired, and not subsequently misused." *Id.* at 446. Although Beasley and Cash did claim to have innocently discovered the notebook on the factory floor, a factor that supports their claim that their actions were protected activity, it is their actions *after* acquiring the notebook that make their conduct unreasonable. Had either Beasley or Cash

merely disclosed their possession of the notebook to Whirlpool or even to their attorneys, as the plaintiff in *Kempcke* did, this court would have been confronted with a situation analogous to that which the Eighth Circuit held constituted protected activity.

Beasley and Cash's remaining arguments are without merit. As Beasley and Cash see it, the district court failed to consider the temporal proximity of the terminations to Beasley and Cash's depositions. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008). However, the plaintiffs in this case filed their complaint in 2003, but Beasley and Cash were not terminated until 2006. As the district court noted, the temporal evidence in this case is not helpful to Beasley and Cash because their terminations occurred more than two years after this lawsuit was filed, and it was only during the depositions that Whirlpool learned of Beasley and Cash's misconduct involving the supervisor's notebook. *Armstrong*, 2008 WL 4525413 at *11. Beasley and Cash also contend that Whirlpool failed to conduct any meaningful investigation into the terminations, but the record shows that each plaintiff received a full hearing from a neutral arbitrator and that the terminations were upheld in each case.

Because Beasley and Cash have failed to meet their burden of raising a genuine issue of material fact as to whether Whirlpool's legitimate reasons for terminating them were merely pretextual, Whirlpool is entitled to summary judgement on the retaliation claims.

**IV.**

For the foregoing reasons, the judgment of the district court granting summary judgment for Whirlpool on the hostile work environment claims of Talley and Swader, and the retaliation claims of Beasley and Cash, is AFFIRMED. The judgment of the district court granting summary judgment to Whirlpool on the hostile work environment claims of Armstrong, Beasley, and Cash is REVERSED, and their cases are remanded.