NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0349n.06

Case No. 22-5564

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 31, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| FLOYD SESSON, JR., | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT OF |
| UNITED PARCEL SERVICE, INC., | ) | TENNESSEE |
| Defendant-Appellee. | ) | |
| | ) | OPINION |

Before: MOORE, ROGERS, and GRIFFIN, Circuit Judges.

ROGERS, Circuit Judge. In this action brought under Title VII of the Civil Rights Act, Floyd Sesson, Jr., claimed that while working as a parts mechanic at UPS, he endured repeated discriminatory incidents because he is African American, and because he had filed complaints against his managers. He contended among other things that UPS did not permit him to get paid overtime while white mechanics in his unit could get overtime, that UPS treated him poorly as a result of complaints he had filed with state and federal equal employment agencies, and that UPS made him endure a racially hostile work environment. His appeal challenges the district court's grant of summary judgment to UPS on these three asserted bases for relief. While these three arguments appear to be the strongest of the various arguments he raised below, none warrants reversal of the district court's thoughtful opinion. Sesson has not shown that UPS's decision to

deny him overtime was pretextual, that UPS did so in response to the filing of his complaints, or that UPS created a work environment with severe and pervasive harassment.

For over thirty years, UPS has employed Floyd Sesson, Jr., an African American, as a mechanic. UPS uses a bid system to dole out work positions: Every six months, its mechanics will "bid" on jobs in order of seniority. As the most senior mechanic, Sesson has continuously bid for, and received, the "Parts" position at UPS's Whites Creek Automotive facility in Tennessee. In that role, Sesson orders parts that mechanics need to repair UPS's delivery trucks.

Since November 2015, Sesson has answered directly to Shad Boots, the Automotive Fleet Supervisor. Boots in turn answered to Ronnie Price, the Automotive Fleet Manager, from January 2015 to October 2018.

Sesson alleges that in 2016, he began experiencing several discriminatory incidents at work. The trouble first started in September, when a technician blocked the facility's garage door entryway. Without a means to exit the garage, Sesson and others could not use a tow motor to haul parts in and out. Sesson complained to Price. Price suggested to Sesson and the technician that they keep to their own areas. When the technician continued blocking the door, Sesson complained again to Boots and Price, but this time he made his complaint along with Kevin Phelan—a white automotive technician. Both Boots and Price told the technician to stop blocking the door.

About eight months later in May 2017, Sesson filed his first charge of discrimination with the Equal Employment Opportunity Commission and the Tennessee Human Rights Commission. Sesson had taken disability leave due to a shoulder injury he incurred when he could not use the tow motor to haul parts. Sesson's charge stemmed from Boots's and Price's responses to his complaints about the technician. Both commissions dismissed the charge.

During Sesson's leave, the Whites Creek facility changed buildings. According to Price and Boots, operational changes at the new facility required them to push the parts position's 6 a.m. start time to later in the morning. Phelan agreed to temporarily fill in for Sesson, but only if he could keep the normal start time (which UPS agreed to do). While management had agreed to Phelan's request, they frequently changed the start time after Sesson returned, moving it from noon to 10 a.m. to 9 a.m. to 8 a.m. until deciding on 7 a.m. Another mechanic heard Price say that he could "change [the parts bid start time] so [Sesson] won't take it."

The strained relationship between Price and Sesson prompted Sesson to file another complaint with the Tennessee Human Rights Commission around October 25, 2017. He claimed that Price repeatedly showed hostility towards him by staring at him in a threatening manner or engaging in heated conversations. About a year later, UPS replaced Price with Duane Holmquest.

On November 27, 2018, Holmquest informed all automotive supervisors that due to cost-cutting directives, non-direct cost employees—those that cannot charge work to a specific vehicle repair—could no longer work overtime. As a strictly parts employee, Sesson's work was classified as non-direct, and UPS denied him overtime. Shortly after, Sesson submitted grievances with his Union and another complaint with the Tennessee Human Rights Commission about the denial of overtime work.

Around January 2020, management decided to increase security and eliminate facility blind spots by installing new cameras in the breakroom and parts department. The parts camera captured Sesson's workstation and anyone walking by the department.

Over these years, other mechanics thought UPS management acted with racial bias. Fred Summers, a black automotive technician, thought that Price disrespected him and gave his white colleagues "special privileges." Steve Calvert, a white mechanic, thought that Price did not like

3

black people because he applied a "double standard" when taking disciplinary measures. Phillip Gallucci, a white mechanic, witnessed Price show favoritism towards his white colleagues over his black ones a "handful of times." For example, he would allow white colleagues to "stand around or eat" but not allow "other employees to do the same."

Phelan also thought Price showed favoritism based on race a "time or two." When Sesson's start time changed, Phelan thought that management had "something against this man," that could "[m]aybe [be] his race." Phelan also said that when the garage-door entryway incident occurred, he thought that Boots and Price managed to get the technician's "attention" more when Phelan complained rather than Sesson, and when Phelan also had a camera placed above his workstation, he thought that the camera above Sesson's workstation was "much closer" and situated right "over [Sesson's] head."

Sesson filed this suit against UPS in December 2019, and filed his amended, operative complaint in July 2020, alleging race discrimination, retaliation, and hostile work environment, in violation of Title VII of the Civil Rights Act of 1964. UPS moved for summary judgment, and the district court granted it on all of Sesson's claims.

The district court's opinion started with the race discrimination claim. It first concluded that Sesson's claim hinged on UPS's deprivation of an opportunity to work overtime. Looking at the merits, the court accepted that Sesson had established his prima facie case of race discrimination, because "perplexing[ly]," UPS had failed to argue that issue. The court held that, in any event, Sesson's race-discrimination claim failed because UPS presented evidence that it cut overtime for parts employees to reduce costs, and Sesson failed to present pretextual evidence casting doubt on the validity or truth of that reason.

Turning to Sesson's retaliation claims, the court held that these claims failed because he did not establish a causal connection between his October 2017 complaint and UPS's November 2018 overtime directive. Over a year had passed between the two events, making them too remote in time to support an inference that they were connected. As for Sesson's November 2018 complaint, that came *after* the overtime directive. Even if Sesson could have made out a prima facie case, the court reasoned, his retaliation claim would have failed on pretext grounds for the same reasons as his race discrimination claim.

Last, when assessing Sesson's hostile work environment claim, the court held that no record evidence supported a finding that the alleged discriminatory incidents were either race-based or severe and pervasive.

The district court accordingly granted summary judgment for UPS, and Sesson now appeals. Sesson's counsel has commendably focused his appeal on three particular arguments: (1) that his race discrimination claim was supported in that UPS engaged in race discrimination by denying him overtime, (2) that his retaliation claim was supported by a sufficient causal connection between his filed complaints and the denial of overtime, and (3) that there was sufficient evidence to support his claim of a racially hostile work environment. However, none of these arguments warrants reversal.

First, as the district court held, Sesson's race discrimination claim based on his denial of overtime fails for lack of a sufficient showing that UPS's denial of overtime was pretextual. Such a showing is required in an employment discrimination case where, as assumed by the parties and the district court, Sesson has made a prima facie case of discrimination and UPS has set forth a legitimate basis for denying overtime assignments. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020).

The district court correctly determined that Sesson has not created a factual dispute on pretext. Here, UPS informed all automotive supervisors that non-direct employees, such as parts employees, could no longer work overtime to cut costs. No record evidence casts doubt on UPS's desire to cut costs, or its ability to do so by denying overtime pay to non-direct cost employees (those that could not charge work to a specific vehicle).

One way to demonstrate pretext is to show that the legitimate reason "did not actually motivate the employer's action," *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009), and Sesson contends that cost-cutting did not actually motivate UPS's denial of overtime. Sesson's argument is that UPS did not apply its policy consistently. He points to three white mechanics that UPS allowed to work overtime in the parts department when he could not. But the three other mechanics could charge overtime on parts incidental to their job duties working on specific vehicles. The cost-cutting policy did not apply to them. Sesson admitted as much. Moreover, when Sesson worked on a specific vehicle repair, he could log overtime, too. All told, the record evidence shows that UPS allowed direct-cost but not indirect-cost employees to work overtime, in accord with its cost-cutting policy. The district court thus correctly concluded that Sesson's race discrimination claim could not survive summary judgment.

Sesson's next argument on appeal—that UPS denied him overtime in retaliation for the October 2017 and November 2018 complaints that he filed—was also properly dismissed on summary judgment. To make out a prima facie case of retaliation, Sesson must show that: "(1) he . . . engaged in protected activity, (2) [UPS] knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against [him], and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). Sesson's claim fails on the last prong.

Sesson has not created a factual dispute on whether UPS's denial of his overtime request was causally connected to his complaint filings. First, with respect to Sesson's October 2017 complaint, UPS's decision to deny Sesson overtime starting on November 27, 2018, is far too remote in time from the October 2017 complaint to establish causation. For instance, in *Kenney v. Aspen Technologies, Inc.*, 965 F.3d 443, 449 (6th Cir. 2020), we held that a 75-day gap "standing alone" was not sufficient, and in *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272–73 (6th Cir. 1986), we explained that a 4-month gap was not sufficient without additional evidence. The other alleged protected activity—Sesson's complaint in late 2018 alleging that UPS denied him overtime based on his race—came *after* UPS denied him overtime, not before. UPS therefore could not have made its overtime decision in retaliation for that complaint.

Sesson's reliance on *Harrison v. Metropolitan Government*, 80 F.3d 1107 (6th Cir. 1996), *overruled on other grounds as recognized by Jackson v. Quanex Corp.*, 191 F.3d 647, 667 n.6 (6th Cir. 1999), and *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555 (6th Cir. 2004), is misplaced. In *Harrison*, an employer terminated an employee one year and three months after he filed a charge of discrimination. 80 F.3d at 1119. We held that the employee had established a causal connection because, in addition to the one-year gap, the employer had engaged in other retaliatory behaviors such as making "repeated comments that suggested he would not hesitate to run employees out," causing other employees who testified to fear retaliation, and taking "every opportunity to make [the employee's] life . . . unpleasant." *Id.* Unlike the employee in *Harrison*, Sesson relies on temporal proximity alone for his retaliation claim.

*Singfield* is also distinguishable. The employer terminated the employee "just over three months after he filed a discrimination charge with the employment commission." 389 F.3d at 563. The same temporal proximity does not exist here, where the November 27, 2018, denial of

overtime came over a year after Sesson's October 2017 complaint and before his second one. All in all, the district court properly concluded that a reasonable juror could not find that UPS denied Sesson overtime because Sesson filed a discrimination charge.

Even if Sesson had shown that a factual dispute exists as to the causal connection between his complaints and UPS's decision to deny him overtime, the district court likewise properly concluded that Sesson could not meet his burden on pretext for the same reason he could not do so on his race discrimination claim.

Finally, Sesson's claim that UPS created a hostile work environment was also properly dismissed on summary judgment.

As an initial matter, most of the incidents that Sesson complains of cannot form the basis of his hostile work environment claim because he does not have any knowledge of their occurrence. It is true that other mechanics—Summers, Calvert, Phelan, and Gallucci—testified that they thought Price treated black mechanics worse than white mechanics. When asked to give specific examples, however, they claimed that Price would give white mechanics special privileges, mete out punishment differently to a white employee versus a black employee, give white employees greater leniency on issues of attendance, and allow white employees to stand around more compared to black employees. One mechanic also heard Price mention that he could "change this bid [for the parts department job] so [Sesson] won't take it." While an employee need not personally experience hostility to make out a hostile work environment claim, the employee must know of the hostile incidents. *See Strickland v. City of Detroit*, 995 F.3d 495, 505 (6th Cir. 2021); *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 328–29 (6th Cir. 2010). Sesson does not claim personal knowledge, firsthand or secondhand, of these incidents, which means they cannot create a factual dispute as to the hostile environment he experienced.

8

To the extent Sesson relies on incidents that he experienced, they were not severe or pervasive enough to alter his employment. From 2016 to 2020, Sesson points to four incidents: (1) when Price and Boots responded more effectively to his complaints about another technician blocking the garage door when he complained with his white colleague; (2) when Price and Boots changed Sesson's bid start time multiple times after he returned from disability leave in 2017; (3) when UPS denied him overtime in 2018 as part of cost-cutting measures; and (4) when UPS installed a camera directly above Sesson's work station in 2020. But these four isolated and unrelated incidents occurring a year or more apart from each other did not "permeate[] [Sesson's workplace] with 'discriminatory intimidation, ridicule or insult' sufficiently severe or pervasive to alter the conditions of employment." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65–67 (1986)).

When alleging a race-based hostile work environment claim, Sesson must show that "(1) [he] belongs to a protected class; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) [UPS] knew or should have known about the harassment and failed to take action." *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017). The harassment must be "sufficiently severe or pervasive to alter the conditions" of Sesson's employment. *Id.* (quotation omitted). That "high bar" requires us to consider the frequency, severity, and threatening nature of the conduct. *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020). "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). A reasonable juror would not infer that Sesson suffered severe and pervasive harassment.

*Clay v. UPS*, 501 F.3d 695 (6th Cir. 2007), provides little support for Sesson's position. An employee's supervisor routinely criticized her and singled her out compared to her white colleagues. *Id.* at 706. While we agreed that the employee had shown that the harassment occurred based on race, the fifteen incidents she pointed to over a two-year period did not rise to actionable severe and pervasive harassment. *Id.* at 707–08. Sesson points to less egregious conduct: four isolated incidents over a four-year period. Summary judgment was appropriate on this claim.

The judgment of the district court is affirmed.